**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| MARK ROBINSON, on behalf of himself and all others similarly situated, | Case No. 4:24-cv-391-AW-MAF |
| *Plaintiff*, | **CLASS ACTION** |
| v. | SECOND AMENDED CLASS ACTION COMPLAINT |
| TRULIEVE INC., | **DEMAND FOR JURY TRIAL** |
| *Defendant*. | |

Plaintiff Mark Robinson, on behalf of himself and all others similarly situated, brings the following Class Action Complaint (the "Action") against Defendant Trulieve Inc. ("Trulieve"), for actual damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post- judgment interest and reasonable costs and attorneys' fees, and other relief upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of his counsel, as follows:

## I. INTRODUCTION

*Your privacy is important to us.*

Trulieve Privacy Policy[1]

1. Using marijuana for medical relief is not a casual purchase—it is, in the Florida Legislature's estimation, "a personal and private matter between [doctor and patient]."[2] When considering legislation to decriminalize cannabis within Florida's sovereign borders, Florida lawmakers warned that public exposure of a patient's cannabis use or of the certifying physician's recommendation "could be used to embarrass, humiliate, harass, or discriminate against the patient, caregiver, or the

[1] https://www.trulieve.com/privacy, (last visited June 22, 2025). Since filing this action, Trulieve has updated its privacy policy. The version in use when Plaintiff Mark Robinson used the website is available at https://web.archive.org/web/20241217203639/https://www.trulieve.com/privacy (last visited June 22, 2025).

[2] Fla. H.R. Staff Analysis, HB 7005, at 6 (2022), available at https://www.flsenate.gov/Session/Bill/2022/7005/Analyses/h7005c.SAC.PDF.

physician."[3] Expressly on account of the unique stigma associated with medical marijuana use,[4] Florida carved medical-marijuana records out of its normally sweeping Sunshine Law. *See* Fla. Stat. § 381.987(1).

2. Dispensaries therefore shoulder a heavy duty: patients entrust them with highly sensitive health details—including medical marijuana card numbers, qualifying conditions, and purchase histories—on the understanding that this information will remain strictly confidential.

3. Trulieve is the largest medical marijuana dispensary conglomerate in the State of Florida and markets and sells marijuana to consumers across the United States. As one of the United States' largest purveyor of marijuana products, Trulieve knows, or should know, the importance of protecting its customers' privacy. Trulieve admits on its own website that customers' privacy "is important." However, on Trulieve's website (Trulieve.com), where medical marijuana patients seek to find relief for painful (and sometimes terminal) illnesses, Trulieve permits an astounding number of third-party companies[5] to deploy tracking or cookie

[3] *Id.*
[4] The quoted language originates from the Florida Legislature's statement of public necessity, a constitutionally required justification for exempting any information from the state's Sunshine Laws. *See* Art. I, § 24(c), Fla. Const.
[5] These companies are, at a minimum:

Ad trackers (code on websites containing advertising technology to build advertising profiles or to identify visitors of websites) include but not limited to: eyeota Limited, IPONWEB Gmbh, PubMatic, Inc., Alphabet, Inc., Zeta Global, Twitter, Inc., Oracle Corporation, LiveIntent Inc., Telaria, Index Exchange, Inc., Adform A/S, Adobe, Inc., OpenX Technologies Inc., LiveRamp Holdings, Inc. Adelphic,

technology that monitor visitors' every move.

4. Thus, in addition to being a major seller of marijuana products, Trulieve is also a major seller of customer information, which then goes on to be sold, potentially unlimited times to any number of third parties. While Trulieve is very much a marijuana company, it is very much also a data processor. The data and knowledge that Trulieve has—whether certain individuals are cannabis users—is highly valuable to other cannabis companies and ancillary cannabis businesses. This is especially true with respect to the provision of medical services through the sale of marijuana in states where marijuana is only legal for medicinal purposes.

5. In the course of doing business to provide these medical services, Trulieve collects personally identifiable information and sensitive health information through the Trulieve website. The personal and health information Trulieve collects includes but is not limited to: full name, email address, internet protocol address (which can reveal users' location), information about medical marijuana purchases and activity on the Trulieve website, and physical location

---

Inc., Neustar, Inc., Media.net, Advertising FZ-LLC, The Trade Desk, Inc., Microsoft Corporation, Beeswax and Magnite, Inc.

<u>Third-party cookies</u> (code on websites used by advertising tracking companies to profile users based on internet usage) include but not limited to: Index Exchange, Inc., eyeota Limited, Collective Roll, Trade Desk, Inc., Twitter, Inc., Adelphic, Inc., Zeta Global, Alphabet, Inc., Adobe, Inc., Beeswax, LiveRamp Holdings, Inc., Microsoft Corporation, IPONWEB Gmbh and Magnite, Inc, Blueshift Labs, Inc., Surfside Solutions, Inc., Glassbox, StackAdapt, Inc., Basis Technologies (formerly Site Scout), Rocketfuel, and RFIhub.

using geolocation data.[6] And while Trulieve states that it collects this information in its Privacy Policy, it does not disclose that it is selling medical information—including the fact that users are browsing and buying marijuana for medical purposes—to advertisers like Google, Oracle, and Microsoft.

6. Marijuana consumers, and, especially, medical marijuana patients, like any other medical patients needing any other medication, have a fundamental right to privacy. These patients would not assume that upon entering a brick-and-mortar dispensary, their movements were being monitored and records of their activities sold to third parties for advertising. And thus these patients *also* do not assume that when they *digitally* walk into Trulieve, by visiting Trulieve's website to browse and purchase marijuana products online, that Trulieve has invited 20+ other companies to monitor them and use their most personal information (their use of marijuana) for advertising purposes. Moreover, many marijuana users fear potential repercussions of their family, their employer, or the federal government finding out that they use cannabis: a product which remains federally illegal.

7. When using the Trulieve website, Plaintiff did not anticipate or consent to the use of extensive tracking technology that would transmit personal health information to dozens of corporations scattered throughout the digital world.

[6] https://www.trulieve.com/privacy, (last accessed Sept. 16, 2024). Since filing this action, Trulieve has updated its privacy policy. The version in use when Plaintiff Mark Robinson used the website is available at https://web.archive.org/web/20241217203639/https://www.trulieve.com/privacy (last visited June 22, 2025).

Against this backdrop, Plaintiff, on behalf of himself and all others similarly situated, brings this Action, seeking actual damages, statutory damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post- judgment interest and reasonable costs and attorneys' fees under state law.

## II. JURISDICTION AND VENUE

8. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than at least one Defendant (namely, Plaintiff Robinson is a Florida resident and Defendant Trulieve is domiciled in Florida).

9. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because its headquarters is located in the state of Florida—specifically, in this District. Additionally, this Court has personal jurisdiction over Defendant because Defendant intentionally availed itself of this jurisdiction by choosing to do business in Florida. Defendant Trulieve has over 100 locations in Florida, serving over 100,000 patients, and Trulieve knew or should have known that their tracking technologies were being used to intercept the actions of Plaintiff and Class members on the Trulieve website.

10. *Venue.* Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant Trulieve is located in this District, the Defendant conducts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## III. PARTIES

*Plaintiff Mark Robinson*

11. Plaintiff Mark Robinson is a Florida resident domiciled in Brevard County.

*Defendant Trulieve, Inc.*

12. Defendant is a Florida corporation with its U.S. headquarters located at 6749 Ben Bostic Road, Quincy, Florida 32351.

13. Trulieve is the largest marijuana dispensary conglomerate in the State of Florida, with over 130 locations and six processing facilities. Trulieve's 2023 revenue was $1.129 billion.

14. Trulieve also operates dispensaries in seven other states (Arizona, Pennsylvania, West Virginia, Georgia, Maryland, Ohio, and Connecticut). Currently, Trulieve operates 192 dispensaries spread throughout the states in which it is licensed to sell marijuana products and has 16 U.S. processing facilities.

15. According to Trulieve, "[Trulieve is] able to collect and analyze data to discern customer preferences, patterns and trends" which "inform…

production[,] product allocation, promotional strategies and *targeted outreach*."[7]

## IV. FACTUAL BACKGROUND

### A. Marijuana in the United States

16. In the United States, cannabis-derived products were commonly used as medicine for ailments and chronic pain during the 19th and into the 20th century. But in 1937, with the passage of the "Marihuana Tax Act," the federal government imposed stringent federal restrictions on the use and sale of cannabis in the U.S. And, from about 1937 through the mid-1990's, cannabis consumption of any kind was by and large forbidden in the U.S.

17. Throughout this period, cannabis consumption developed a negative stigma and was (and is) used as a pretext to arrest predominantly men and women of color in many places throughout the country.[8] These pretexts and divisions along racial lines still have not faded.

18. In 1996, California became the first state to allow the consumption of cannabis for medical purposes. Since then, most states have legalized medical marijuana use. Additionally, several states have legalized cannabis consumption—

---

[7] Trulieve Cannabis Corp., Form 10-K (2023), *available at* https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318116443&type=HTML&symbol=TCNNF&cdn=39b20d549f73f87d2eb2a0126efc764a&companyName=Trulieve+Cannabis+Corp+%28Sub+Voting%29&formType=10-K&dateFiled=2024-02-29, (last visited June 22, 2024).

[8] *See, e.g.*, Amanda Geller *et al.*, *Pot as Pretext: Marijuana, Race, and the New Disorder in New York City Street Policing*, 7 J. of Empirical Legal Studies 591 (2011); Maha N. Mian *et al.*, *Policing Pot: State-Level Cannabis Arrests Increase Perceived Risks and Costs but Not Use*, 5 Cannabis 40 (2022); Alex Kreit, *Marijuana Legalization and Pretextual Stops*, 50 Univ. of Cal. L. Rev. 741 (2017).

though with differing rules on specific types of consumption—for recreational use, beginning with Washington and Colorado in 2012.

19. The current patchwork of state-by-state cannabis consumption laws appears as follows:




20. In very short time, cannabis has been effectively legalized in state markets across the country. This drastic and rapid change in policy left many previously barred entrants rushing to get a piece of this newly formed legal market for cannabis.

**B. Trulieve's Violations of Privacy**

21. Trulieve is one of the largest owners and operators of cannabis dispensaries in the United States. Trulieve currently operates in:

a. Arizona (recreationally legal),

b. Connecticut (recreationally legal),

c. Florida (medicinally legal),

d. Georgia (limited products allowed for resale),

e. Maryland (recreationally legal),

f. Ohio (medicinally legal),

g. Pennsylvania (medicinally legal) and

h. West Virginia (medicinally legal).

22. In each of these states, as well as from any state in the United States, consumers can access Trulieve's range of products through its website.

23. In the course of doing business to provide medical marijuana to patients, Trulieve collects a granular mix of personal and health information at every step of a patient's visit.

**i. Transmission to Third Parties: Pixels, Trackers, and Cookies**

24. This is how the third-party advertisers intercept users' information: Trulieve places or allows to be placed onto its website different types of code that are intended to and do collect the data that users input into the website and/or data

evidencing consumers' use of the website, in combination with users' identifying information (such as IP address and, for certain trackers, other unique identifiers).

25. This practice runs contrary to state and federal law and to commonly accepted practices with respect to the sanctity of health information.

26. The trackers that Trulieve has placed or allowed to be placed on its website belong to the following entities[9]:

a. Ad trackers (code on websites containing advertising technology to build advertising profiles or to identify visitors of websites) include but not limited to: eyeota Limited, IPONWEB Gmbh, PubMatic, Inc., Alphabet, Inc., Zeta Global, Twitter, Inc., Oracle Corporation, LiveIntent Inc., Telaria, Index Exchange, Inc., Adform A/S, Adobe, Inc., OpenX Technologies Inc., LiveRamp Holdings, Inc. Adelphic, Inc., Neustar, Inc., Media.net, Advertising FZ-LLC, The Trade Desk, Inc. Microsoft Corporation, Beeswax, Magnite, Inc., Throtle, Centro, Inc., Collective Roll, Amobee, Blueshift Labs, Inc., Surfside Solutions, Inc., Glassbox, StackAdapt, Inc., Basis Technologies (formerly Site Scout), Rocketfuel, and RFIhub.

b. Third-party cookies (code on websites used by advertising tracking companies to profile users based on internet usage) include but not

[9] These ad trackers have been present on Trulieve's website during the applicable statute of limitations.

limited to: Index Exchange, Inc., eyeota Limited, Collective Roll, Trade Desk, Inc., Twitter, Inc., Adelphic, Inc., Zeta Global, Alphabet, Inc., Adobe, Inc., Beeswax, LiveRamp Holdings, Inc., Microsoft Corporation, IPONWEB Gmbh, Magnite, Inc, Throtle, and Amobee, Inc.

27. Other than the aforementioned trackers and third-party cookies placed on Trulieve's homepage, a concerning number of trackers can be found on Trulieve's website in other locations that obtain personal and health information:

a. As of July 2, 2025, on Trulieve's page called "Find a Doctor", there are 27 different ad trackers[10] and at least 47 different third-party cookies.[11]

b. As of July 2, 2025, on Trulieve's "Get Your Medical Marijuana Card" page, there are 27 different ad trackers[12] and at least 47 different third-party cookies.

c. Trulieve accountholders' account pages, where consumers with

---

[10] These include scripts belonging to Index Exchange, Throtle, Neustar, Inc., Media.net Advertizing FZ-LLC, Alphabet, Inc., Telaria, Collective Roll, eyeota Limited, Twitter, Inc., Centro, Inc., Zeta Global, IPONWEB GmbH, Amobee, Inc., LiveIntent Inc., Microsoft Corp., LiveRamp Holdings, Inc., PubMatic, Inc., and Adobe, Inc.

[11] These include cookies belonging to Collective Roll, Zeta Global, Adobe Inc., Alphabet Inc., Microsoft Corp., Index Exchange, Inc., LiveRamp Holdings, Inc., IPONWEB GmbH, eyeota Ltd., Amobee, Inc., and Throtle.

[12] These include Media.net, Advertising FZ-LLC, Adobe Inc., Microsoft Corp., eyeota Ltd., Neustar, Inc., Alphabet, Inc., LiveRamp Holdings, Inc., Zeta Global, Telaria, Twitter, Inc., Throtle, OpenX Technologies Inc., Centro, Inc., Collective Roll, PubMatic, Inc., Index Exchange, Inc., IPONWEB GmbH, and Amobee, Inc.

medical marijuana cards can enter information including Medical ID number, issuing state, issuing date, and physician names, also include numerous trackers and cookies. The same is true for Trulieve accountholders' wishlists and order histories.

28. The widespread use of ad trackers and third-party cookies on Trulieve's website, especially the informational pages that contain health information, would shock a reasonable consumer.

29. When a user registers, signs in, or simply browses a product page, Trulieve's embedded scripts transmit, either in whole or in part, the following information to third parties operating ad trackers or cookies on the site—often in clear text or shallowly hashed form:

a. Identity fields – full legal name, e-mail address, and an internal "customer_id" value that links all subsequent activity to the same patient. Trackers also transmit multiple persistent device IDs and user digital fingerprints.

b. Regulated-use details – every keystroke and screen change as soon as a page loads. Except for the search bar and one auto-complete field, no inputs are masked. Consequently, any medical-marijuana details a patient types—card number, certifying physician, issue date, state—are captured and pushed to the vendor's cloud in real time. Separate

tags also relay the patient's chosen dispensary name, region, and store ID.

c. Contact and device coordinates – postal address (entered during checkout), IP address, geolocation derived from the address and IP, precise time zone, language, screen resolution, browser architecture, and operating-system version.

d. Behavioral and transactional context – every page URL and title (which likely disclose cart contents and product and treatment SKUs), the referring URL, the dispensary name/region/ID the patient selects, scroll depth, mouse movements, keystrokes, and the A/B-test bucket assigned for site experiments.



*The contents of the Blueshift tracking payload, transmitting full name and email address for a pseudonymous account.*

30. This data grab happens automatically in the background, every time a page loads. When a user creates and account or logs in, and opens a Trulieve page, a tag surreptitiously tacks his name and email onto a hidden web request. The session replay tool immediately begins filming a "screen-recording" of everything he types or clicks—even the contents of most form fields—and shares that video to its own servers. Other trackers embed lasting tags on the user's device so ad networks can link what the user does on Trulieve to external advertising files about them. Simply stated, every page the user opens sends their personal and medical-marijuana details off Trulieve's site and into several outside data systems.

31. Taken together, these data points reveal not only who the patient is but also that the patient is a certified medical-marijuana user, which dispensary they frequent, what products they review or purchase, and when and where each interaction occurs—all highly sensitive health information that a reasonable medical marijuana patient would expect Trulieve to keep confidential.

32. But rather than protect such information, Trulieve sells it to third party advertisers, who receive Plaintiff and Class members' information every time they use the Trulieve website.

**ii. Third Party Cross-Reference, Resale and Mass Dissemination**

33. The third parties receiving Plaintiff and Class members' information

are not mere ministerial vendors performing purely administrative or mechanical tasks on behalf of Trulieve. To the contrary, some trackers on Trulieve's site—those for SiteScout, RocketFuel and RFIhub—support behavioral targeting and real-time bidding ("RTB") for online ads. Once these trackers gather Trulieve patients' data—often in milliseconds—they pool the data with billions of other data points and re-broadcast it throughout the RTB advertising marketplace.

34. The moment a user visits a site, the site asks third parties to run RTB ad auctions to determine which ads it will display for the user.[13] To decide which ad to display on a given page, the third parties first assemble a "bid request" concerning the user. The bid request contains all user information transmitted by the site and any additional user data previously collected or linked from external sources. "The information in bid requests is called 'bidstream data' and can easily be linked to real people."[14]

35. That bid request is then broadcast—within milliseconds—to thousands of demand-side platforms, data brokers, and advertisers worldwide.[15]

36. Every recipient of the bid request gets the data, whether it bids or not.[16] Because RTB's design gives the full bid request to all auction participants, privacy

---

[13] Lena Cohen, *Online Behavioral Ads Fuel the Surveillance Industry—Here's How*, ELECTRONIC FRONTIER FOUNDATION (Jan. 6, 2025), https://www.eff.org/deeplinks/2025/01/online-behavioral-ads-fuel-surveillance-industry-heres-how.
[14] *Id.*
[15] *Id.*
[16] *Id.*

experts describe it as "broadcast[ing] torrents of our personal data to thousands of companies, hundreds of times per day."[17] In other words, a single Trulieve page view propels into a global advertising ecosystem the information it collects from users, believed to include a patient's medical-marijuana status, card number, and purchase details.

37. The scale of exposure is staggering. Industry researchers estimate that hundreds of billions of RTB bid requests are sent every day,[18] meaning Trulieve's trackers funnel patient data into an environment where mass dissemination is not merely possible but inevitable.

38. The risks are not just theoretical. Now public investigations suggest that a government contractor demonstrated in closed-door sessions with national security agencies how RTB data could be used to identify and track individuals using, for instance, mobile dating applications, by accessing the GPS and behavioral data embedded in ad auctions.[19]

39. Through ad exchange trackers embedded in mobile apps and websites, a journalist from Wired could observe user behavior, draw geofences around sensitive government buildings, and link pseudonymous device IDs to specific

[17] *Id.*
[18] *Id.*
[19] Byron Tau, *How the Pentagon Learned to Use Targeted Ads to Find Its Targets—and Vladimir Putin*, WIRED (Feb. 27, 2024), https://www.wired.com/story/how-pentagon-learned-targeted-ads-to-find-targets-and-vladimir-putin/.

individuals.[20] These digital ad auctions "were rife with surveillance potential," with ads that not only followed users around the internet, but also tracked their real-time location and transmitted it to third parties under the guise of advertising.[21]

40. The RTB system is no longer used solely—or even primarily—to display ads. As investigative reporting confirms, an entire commercial ecosystem has grown around the practice of intercepting bidstream data, aggregating it, and reselling it for profiling, location intelligence, and surveillance purposes.[22] These businesses exploit the structure of RTB auctions: even when they do not win a bid to display an ad, participants still receive the full bid request, which may include GPS location, IP address, advertising ID, and browsing behavior.[23] Over time, this industry has developed tools to repackage those bidstreams into dossiers containing deeply personal data, including the user's identity, movements, and behavioral habits. These dossiers are in turn sold in their own publicly accessible marketplaces.[24]

41. The cycle of exposure does not end once the initial RTB bid request is broadcast. On information and belief, many of the third-party recipients of Trulieve

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *See, e.g.*, *FTC Takes Action Against Mobilewalla for Collecting and Selling Sensitive Location Data*, FTC (Dec. 3, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/ftc-takes-action-against-mobilewalla-collecting-selling-sensitive-location-data (announcing settlement prohibiting Mobilewalla from collecting bidstream data from RTB auctions for non-auction purposes and from selling sensitive location data tied to places like health clinics and religious institutions).

patient data—including but not limited to social media platforms, behavioral-ad platforms and data brokers—are themselves connected to secondary and tertiary advertising networks.

42. These downstream recipients repackage the incoming data and initiate their own RTB auctions across other sites and platforms. In those secondary auctions, the same Trulieve-derived bidstream data is included in new bid requests—either directly, through linked user identifiers (e.g., advertising ID, email hash, device fingerprint), or indirectly, through cross-context behavioral modeling. Each time a participating platform rebroadcasts the data for its own RTB auction, it exposes the information that Trulieve has collected and injected into the RTB market, such as patient identity, marijuana use, and purchase behavior, to thousands more recipients.

43. This recursive dissemination continues across multiple layers of the ad-tech ecosystem. Because each RTB recipient retains the bidstream data regardless of whether they place or win a bid, the data is persistently stored, cross-referenced, and resold. Numerous actors—especially those specializing in "audience syndication," "data enrichment," or "impression log monetization"—intentionally capture this data for resale in parallel marketplaces.

44. These data brokers operate with little to no oversight, contractual limitation, or user knowledge. As a result, the Trulieve patient data, once injected

into the RTB environment, does not remain confined to the initial broadcast, but triggers a cascade of disclosures across dozens or even hundreds of interconnected data-sharing relationships, compounding the exposure with each iteration. In this way, the information is not just likely, but functionally guaranteed, to become publicly accessible within the digital advertising and profiling industries.

45. Because Trulieve knowingly funnels protected patient information into these RTB and data-broker ecosystems—and because those ecosystems by design disseminate each bid-stream payload to hundreds or thousands of downstream entities on every page view—the disclosure at issue is, at a minimum, substantially certain to become one of public knowledge.

**iii. Trulieve Patients' Medical Marijuana Use Is a Private Matter**

46. Logically, Trulieve knew or should have known that by embedding code, it was disclosing and permitting advertisers to intercept and collect information shared by its website users, including the personal and health information of Plaintiff and Class members. This is because the code used in this scenario needed to be affirmatively and intentionally placed on the website in order to be used in the way as described herein. The code's entire purpose is to monetize data about Trulieve's customers, and there can be no doubt that the code on the website collects personal and health information and transmits it to third-party advertisers.

47. By repackaging and selling information about consumer medical marijuana usage and purchase, Trulieve's violates reasonable consumer expectations for how Trulieve will treat sensitive medical information.

### *1. HIPAA*

48. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which was passed in 1996, sets a floor for the care that healthcare providers in Florida and across the country are expected to provide in handling patient information. Consumers reasonably expect that healthcare providers will handle their private health information in accordance with HIPAA requirements, including by refraining from sharing that information with ad tech companies. Additionally, by receiving ill-gotten private data, the advertisers each served as a conduit for Trulieve to monetize this precious and private information.

49. In fact, in December 2022, the United States Department of Health and Human Services ("HHS") issued a revised bulletin "to highlight the obligations" of healthcare providers under the HIPAA Privacy Rule "when using online tracking technologies" such as those used by Trulieve, which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application." The bulletin was updated in 2024.[25]

---

[25] U.S. Dep't of Health and Human Servs., *Use of Online Tracking Techs. By HIPAA Covered Entities and Bus. Assocs.* (2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

50. In the bulletin, HHS confirmed that HIPAA applies to healthcare providers' use of tracking technologies like those developed and used by Trulieve on trulieve.com. Among other things, HHS explained that healthcare providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information, even if no treatment information is included and even if the individual does not have a relationship with the healthcare provider:

> How do the HIPAA Rules apply to regulated entities' use of tracking technologies?
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use the regulated entities' website or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates or types of healthcare services.

51. Additionally, HHS further clarified that HIPAA applies to healthcare providers with tracking technologies even on webpages and on mobile applications that do not require patients to login. This HHS bulletin did not create any new

obligations, but instead highlights obligations that have been in place for decades. Reasonable consumers would expect that Trulieve would comply with these obligations with regard to information about the purchase of medical marijuana.

### *2. Florida Law and Social Expectations*

52. A reasonable consumer has an expectation of privacy each time they visit the Trulieve website. Trulieve collects personal and health information from its consumers and consumers rightly presume that such information is going to be protected from unauthorized third parties.

53. Florida law and public policy strongly support a reasonable expectation of privacy in one's personal medical information. It is generally understood—as a matter of common sense and longstanding practice—that when individuals seek medical treatment or use medication for their health, those facts are to be kept confidential.

54. This expectation is rooted in the traditional confidentiality of the physician-patient relationship and the widespread legal protections for medical privacy. For example, Florida's constitution explicitly grants a right to privacy, which Florida courts have found protects a patient's medical records and gives them a confidential status. *See State v. Johnson*, 814 So. 2d 390, 393 (Fla. 2002) ("A patient's medical records enjoy a confidential status by virtue of the right to privacy contained in the Florida Constitution . . . ."). "Indeed, Florida has a long tradition of

recognizing the privacy interests of patients in confidential medical records." *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 205–06 (Fla. 2007).

55. Further, under Fla. Stat. § 395.3025(4), "[p]atient records are confidential and must not be disclosed without the consent of the patient or his or her legal representative," subject only to narrow exceptions for treatment, oversight, or specific court orders.

56. This statutory protection reflects Florida's broader public policy that health-related records are private by default, regardless of where or how the patient seeks care. Further, Fla. Stat. § 395.3025(7)(b) explicitly prohibits use of patient information for marketing or solicitation without specific written consent, underscoring the Legislature's recognition that even the appearance of commercial exploitation of health data is unacceptable. These statutory commands mirror common expectations that disclosures of such records, even to a single third party, are both improper and legally restricted.

57. Even more to the point, the Florida Legislature has made it unmistakably clear that medical marijuana users have a strong expectation of privacy. Florida law exempts a medical marijuana user's personal information from Florida's broad Sunshine laws. Fla. Stat. § 381.987(1). Florida's constitution requires a public necessity statement in order to exempt information from public disclosure under Florida's Sunshine laws. Fla. Const., Art. I, § 24(c).

58. In exempting a medical marijuana user's personal information from Florida's Sunshine laws, the legislature's public necessity statement provides in relevant part:

> The choice made by a physician to certify, and by his or her patient to use marijuana to treat the patient's medical condition or symptoms… ***is a personal and private matter between such parties***… The knowledge of the patient's use of marijuana, the knowledge that the physician certified the use of marijuana, the knowledge of the patient's diseases or other medical conditions, and the knowledge that a caregiver is assisting a patient with medical use of marijuana could be used to embarrass, humiliate, harass, or discriminate against the patient, caregiver, or the physician.

*See* https://www.flsenate.gov/Session/Bill/2022/7005/Analyses/h7005c.SAC.PDF at 6 (emphasis added).

59. This expectation of privacy remains despite the fact the Florida Department of Health maintains a registry for physicians, patients, and caregivers, which is not accessible to members of the general public. The express purpose of that registry under Fla. Stat. § 381.986(5)(a) is to "verify the authorization of a qualified patient or caregiver to possess marijuana or a marijuana delivery device and record the marijuana or marijuana delivery device dispensed." And the Florida's Medical Marijuana Use Registry's privacy policy specifically states "[i]nformation will not be disclosed to third parties or other governmental agencies, unless required by state or federal law. Please note that Florida's public records law requires that all information received in connection with state business be made available to anyone

upon request, unless the information is subject to a specific statutory exemption."[26]

60. As discussed herein, a medical marijuana patient's use of medical marijuana is exempt from Florida's Sunshine laws, and as such, even though a medical marijuana patient appears on the registry, their expectation is that their use, purchase, and treatment of their condition using medical marijuana will not be disclosed, except in limited circumstances, and certainly not broadly to the public. This differentiates a medical marijuana's patient's usage of marijuana from other activities that could be publicly discovered, such as when a tobacco smoker marks himself out as a smoker by using tobacco products openly in public.

61. This expectation of privacy also remains despite the fact that marijuana remains federally illegal. Courts have not treated state laws decriminalizing or legalizing marijuana as preempted by the Controlled Substances Act, nor did Congress intend that the CSA displace all state laws associated with controlled substances. *See* 21 U.S.C. § 903 (limiting preemptive scope of CSA to only state laws that create a "positive conflict" with federal law). Instead, the relationship between the federal marijuana ban and state medical marijuana exemptions must be considered in the context of two separate sovereigns, each enacting separate and independent criminal law regimes with separate and independent enforcement mechanisms. The federal government's decision to ban marijuana therefore does not

---

[26] *See* https://mmuregistry.flhealth.gov/Public/Privacy (last accessed June 23, 2025).

alter the reasonable expectation of privacy afforded medical marijuana patients under Florida law.

62. When a Trulieve customer interacts with the Trulieve website, they are seeking care for their present or future healthcare ailments as well as working to pay for healthcare products—here, cannabis and have a reasonable expectation of privacy under Florida law for that medical marijuana use.

**C. Consumer Harm**

63. Plaintiff and Class members were harmed when Trulieve invaded their privacy rights by selling data about their marijuana consumption, including medical marijuana consumption, to third parties. Reasonable consumers, including Plaintiff, would not have used the Trulieve.com website had they known that their privacy rights would be violated as a result.

64. Personal and health information tied to medical marijuana use is extremely valuable.

65. There is a huge market for health data like the data disclosed to Trulieve on its website. Plaintiff and Class members suffered pecuniary losses when Trulieve sold and resold their data to third parties because of the value of the data itself. Without the freedom to control what becomes of their data, Trulieve.com users are unable to maintain the value of their personal data and use it for whatever purposes they please (or for no purpose other than for health treatment, if they so

choose).

66. The value of consumers' personal and health information is axiomatic. When cybercriminals steal such information, like the information Trulieve sold to its third-party business partners, the criminals face huge fines and lengthy prison sentences. Organizations across every sector use and monetize consumer data to increase profits.

67. And the value of such information as a commodity is measurable. As stated in "Exploring the Economics of Personal Data," "[f]irms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks." Consumer personal information is so valuable to identity thieves that once PII and PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[27] That figure is only due to keep increasing.

68. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462

---

[27] *See* Robert J. Shapiro, *What Your Data is Really Worth to Facebook*, Washington Monthly (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook (last accessed July 1, 2025).

(D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services."). Google has recognized the value of user data and even instituted a pilot program to pay users $3 per week to allow Google to track them online.[28]

69. Several companies have products through which they pay consumers for a license to track their data. Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

70. Meanwhile, consumers "have good reason to worry about data security" according to law firm Foley Hoag.[29] Cybercriminals have successfully targeted medical marijuana databases on multiple occasions, including major

---

[28] *See* Josh Sidorowicz, *Yes, Google will pay you to track what you do on your phone*, WTSP Tampa Bay 10 (Apr. 11, 2024), https://www.wtsp.com/article/news/verify/google-tracking-study-payment-verify/67-1cc2e9a3-f51b-489b-aef8-1477201c0c11 (last accessed July 1, 2025).

[29] https://foleyhoag.com/news-and-insights/blogs/cannabis-and-the-law/2017/march/marijuana-and-privacy-a-primer/, (last accessed July 1, 2025).

breaches in 2016 (Washington State Liquor and Cannabis Board and the Nevada Division of Public and Behavioral Health) and 2017 (a compliance system called MJ Freeway, which is used by medical dispensaries across the country in over 1000 different dispensaries).[30] According to Foley:

> When it comes to privacy, marijuana is different both as a product and as a medical treatment. While patient information of any kind must be safeguarded, there is a special sensitivity about marijuana use. Stigma about cannabis, as well as fears about federal oversi[ght], make marijuana-related data especially vulnerable to breaches. This sensitivity extends to the recreational marijuana industry. Few people look over their shoulder walking into a liquor store, but many customers think twice before walking into a dispensary. People are worried about data falling into the hands of the federal government, but also of their employers.
>
> …
>
> Right now, the needs of consumers and companies seem to be at odds – consumers want less data collection, while tech companies and investors want more.[31]

71. As the cannabis industry continues to grow in the United States, so too are the desires of the advertising industry to profit off the data that accompanies demographic and personal information, as well as consumer interest and consumer purchases.

72. These harms are not hypothetical or speculative—they are precisely the types of injuries the Florida Legislature has already acknowledged and acted to

[30] *Id.*

[31] *Id.*

prevent. The Legislature expressly found that even the mere "knowledge of the patient's use of marijuana" or "knowledge that the physician certified the use of marijuana" can lead to "embarrass[ment], humiliat[ion], harass[ment], or discriminat[ion]" against the patient, caregiver, or physician.

73. These harms stem from the enduring stigma that surrounds marijuana use—even when prescribed for medical purposes—and reflect the Legislature's judgment that disclosing such information poses real threats to a person's dignity, safety, employment, and social standing.

74. Florida's legislative findings confirm what common sense already dictates: when a patient lawfully seeks marijuana-based treatment, disclosing that fact to unauthorized third parties is not benign—it is a disclosure that invites reputational harm, bias, and targeting. Trulieve's actions exposed its patients to precisely these harms.

75. Further, Trulieve's customers reasonably expect, based on their expectation of privacy in their healthcare treatment, that Trulieve will safeguard their private information and not sell it to third parties. They reasonably believe and expect that at least some part of the consideration (pecuniary and otherwise) they are spending for a private transaction will, in fact, be used to ensure the privacy of the transaction.

**D. Plaintiff's Experience**

76. Plaintiff is a medical marijuana patient that suffers from an ailment that the State of Florida legally recognizes as giving eligibility to medical marijuana consumption in Florida.

77. On numerous occasions, Plaintiff has visited the Trulieve website, Trulieve.com, to purchase medicinal marijuana for personal medical use.

78. Plaintiff did not know that his unique identifiers would be paired with the fact that they seek marijuana for medical purposes in a way that could identify Plaintiff to third party advertisers. Plaintiff did not know that the data that Trulieve.com collects would then be sold to dozens of entities for advertising purposes.

79. Plaintiff's use of Trulieve's website for health-related purposes—specifically to obtain physician-recommended marijuana treatment—led to the collection and dissemination of deeply sensitive information. This included not only browsing behavior and product selection, but also identifying data (such as Plaintiff's name, email, and digital fingerprint) and regulated-use details such as the dispensary visited, the types of cannabis products explored, and, depending on the page and form usage, card-related or physician-identifying data.

80. Each of these details was transmitted to a web of advertising trackers embedded on Trulieve's site. From there, Plaintiff's information entered the RTB ecosystem—where, as described above, it was rebroadcast to a global network of

advertisers, analytics vendors, and data brokers. The disclosure did not end with one vendor, but instead initiated a cascading chain of further distribution, cross-referencing, and resale. As a result, Plaintiff's medical use of marijuana was shared across multiple commercial systems without Plaintiff's knowledge or consent.

81. This sharing was not merely technical. It was personal. Plaintiff's decision to seek medical marijuana was based on a serious health condition and was made under the protection of Florida's medical cannabis laws. The information surrounding that decision—his use of Trulieve, his selection of products, his continued visits to the site—is precisely the kind of data the Florida Legislature has warned could result in "embarrass[ment], humiliat[ion], harass[ment], or discriminat[ion]" if made public. And that is what occurred.

82. Plaintiff suffered embarrassment and anxiety upon learning that his health-related browsing and product activity had been captured and shared without his consent. The very knowledge that Plaintiff is a medical marijuana user—combined with granular purchase behavior—was placed into the hands of unknown commercial entities and data brokers. That information can now be cross-referenced with public and semi-public profiles, used in targeted advertising, or exploited by employers, insurers, or other institutions in ways that directly harm Plaintiff's reputation, employment prospects, or access to services.

83. Florida law, federal policy, and societal norms converge on one

principle: health-related treatment choices are intensely private. And marijuana, as the Legislature has confirmed, remains subject to significant stigma and misunderstanding.

84. By permitting a system in which Plaintiff's use of cannabis for medical purposes was repeatedly and widely disclosed to commercial third parties—without notice or consent—Trulieve subjected Plaintiff to precisely the kind of harm the law is designed to prevent.

85. Had Plaintiff known the truth, Plaintiff would not have purchased products from Trulieve or would have spent substantially less money on them. Plaintiff did not get the benefit of his bargain when he spent money on what he believed was a private transaction and instead received a public one.

## V. CHOICE OF LAW ALLEGATIONS

86. Florida's substantive law may be applied to every Plaintiff and Class member without offending the Due Process Clause (U.S. Const. amend. XIV, § 1) or the Full Faith and Credit Clause (U.S. Const. art. IV, § 1). Florida has extensive contacts—and, indeed, the center of gravity—for the conduct challenged in this action, giving the State a paramount interest in having its law govern and ensuring the choice of Florida law is neither arbitrary nor unfair.

87. Trulieve is incorporated under Florida law and maintains its principal place of business at 6749 Ben Bostic Road, Quincy, Florida 32351. From that

headquarters Trulieve directs the design and operation of its website and the tracking technologies that give rise to Plaintiffs' claims. Trulieve also operates more dispensaries, employs more personnel, and earns more revenue in Florida than in any other state. These deliberate Florida contacts are more than sufficient to make application of Florida law constitutionally permissible.

88. All material corporate decisions concerning Trulieve's data-collection and advertising practices were conceived, approved, and implemented in Florida. The servers, marketing personnel, compliance staff, and information-technology teams that configure the challenged pixels, cookies, and software development kits are based principally in Florida. Accordingly, the wrongful interceptions and disclosures alleged herein emanated from within Florida's borders—even when a consumer accessed Trulieve's site from another state.

89. Florida's choice-of-law rules likewise point to Florida. Under Florida's "most significant relationship" test, the place where the tortious conduct occurred and where Defendant is headquartered carry particular weight. Both factors favor application of Florida law to the nationwide class.

90. Florida has a uniquely strong regulatory interest in the privacy of medical-marijuana patients. Its legislature has expressly declared that disclosure of a patient's cannabis-use information "could be used to embarrass, humiliate, harass, or discriminate against the patient." Fla. Stat. § 381.987(1) (public-necessity

statement). Applying Florida law furthers that interest uniformly for every class member whose sensitive data was monetized by a Florida-based cannabis company.

91. Because Trulieve purposely availed itself of Florida law, and because the gravamen of Plaintiffs' claims arises from decisions and conduct centered in Florida, Florida has a far greater interest in regulating this conduct than any other jurisdiction. Florida law therefore governs the claims of all Class members.

## VI. CLASS ALLEGATIONS

92. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in states where medical marijuana (not recreational use) is legal who used the Trulieve.com website and/or mobile application and whose communications and/or data were shared with third parties.

93. In addition, or in the alternative, Plaintiff pleads the following Florida Sub-Class: All natural persons in Florida who used the Trulieve.com website and whose communications and/or data were shared with third parties.

94. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

95. *Numerosity*. The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and the members can be identified through Defendant's records.

96. *Predominant Common Questions*. The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendant violated Plaintiff's and Class members' privacy rights;

b. Whether Defendant was unjustly enriched;

c. Whether Defendant's acts and practices violated state consumer protection laws;

d. Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

e. Whether Plaintiff and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

97. *Typicality*. Plaintiff's claims are typical of the claims of the other members of the claims of Plaintiff and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

98. *Adequate Representation*. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

99. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

100. Plaintiff may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VII. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**

BREACH OF CONFIDENCE

(On behalf of Plaintiff and the Class)

101. Plaintiff re-alleges and incorporates paragraphs 1 through 100 with the same force and effect as if fully restated herein.

102. Medical providers, including those that dispense prescription or physician-certified medication, have a duty to their patients to keep non-public medical information completely confidential.

103. A physician's recommendation or certification that a person use marijuana for a medical purpose, and that person's purchase and use of marijuana for that purpose, is medical and health information.

104. Plaintiff and the Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on its website.

105. This expectation is rooted in the traditional confidentiality of the physician-patient relationship and the widespread legal protections for medical privacy, including under the Florida constitution and Florida statutes explicitly protecting patient records. Fla. Stat. § 395.3025(4); Fla. Stat. § 395.3025(7)(b).

106. Even more to the point, the Florida Legislature has made it

unmistakably clear that medical marijuana users have a strong expectation of privacy. Florida law exempts a medical marijuana user's personal information from Florida's broad Sunshine laws. Fla. Stat. § 381.987(1). Florida's constitution requires a public necessity statement in order to exempt information from public disclosure under Florida's Sunshine laws. Art. I, s. 24(c), Fla. Const.

107. Contrary to its duties as a medical provider, Trulieve installed tracking technologies to disclose and transmit Plaintiff's and the Class Members' communications, including personal health information, to unauthorized third parties. These disclosures were made without Plaintiff's or the Class Members' knowledge, consent, or authorization, and were unprivileged.

108. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

109. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information and communications, Plaintiff and the Class Members were damaged. Specifically, Trulieve's breach of confidence of the Plaintiff and the Class Members damaged Plaintiff and the Class Members in that:

1. Sensitive and confidential medical information that Plaintiff and the Class Members intended to remain private is no longer private;

2. Plaintiff and the Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;
3. Defendant eroded the essential confidential nature of the provider-patient relationship;
4. Plaintiff's and the Class Members' rights were violated by Defendant, entitling them to damages in an amount to be determined at trial;
5. Plaintiff and the Class Members are entitled to nominal damages for each independent violation;
6. Defendant took something of value from Plaintiff and the Class Members and derived benefit therefrom without their knowledge or informed consent and without compensation for such data;
7. Plaintiff and the Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and
8. Defendant's actions diminished the value of Plaintiff's and the Class Members' personal health information.

110. Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Trulieve's actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct

in the future.

111. Plaintiff also seeks such other relief as the Court may deem just and proper.

**SECOND CAUSE OF ACTION**

BREACH OF IMPLIED CONTRACT

(On behalf of Plaintiff and the Class)

112. Plaintiff re-alleges and incorporates paragraphs 1 through 100 with the same force and effect as if fully restated herein.

113. By accessing Trulieve's website and browsing and purchasing products, Plaintiff and Class members each respectively entered into an implied contract with Trulieve in which Trulieve agreed to safeguard information the personal health information provided by Plaintiff and the Class Members to Trulieve during their medical marijuana purchasing activities.

114. Plaintiff's and the Class Members' provision of this sensitive and precious information to Trulieve, and Trulieve's receipt of the same, created an implied promise on the part of Trulieve to treat such information in accordance with typical expectations surrounding medical information generally. Consumers seeking medical care, including through medical marijuana, have a reasonable expectation of privacy in their health information. Plaintiff and the Class Members had reasonable expectations of privacy in their communications exchanged with

Defendant, including communications exchanged on its website.

115. This expectation is rooted in the traditional confidentiality of the physician-patient relationship and the widespread legal protections for medical privacy, including under the Florida constitution and Florida statutes explicitly protecting patient records. Fla. Stat. § 395.3025(4); Fla. Stat. § 395.3025(7)(b).

116. Even more to the point, the Florida Legislature has made it unmistakably clear that medical marijuana users have a strong expectation of privacy. Florida law exempts a medical marijuana user's personal information from Florida's broad Sunshine laws. Fla. Stat. § 381.987(1). Florida's constitution requires a public necessity statement in order to exempt information from public disclosure under Florida's Sunshine laws. Art. I, s. 24(c), Fla. Const.

117. The existence of a Privacy Policy is further evidence of the implied contract between Plaintiff and the Class members, on the one hand, and Trulieve, on the other. There would be no purpose for a privacy policy if the expectation that Trulieve maintain consumer privacy were unfounded or unreasonable.

118. Plaintiff and Class members had a reasonable expectation that Trulieve would keep their personal and health information confidential as no language in Trulieve's Privacy Policy makes it clear to a user that their personal and health information would not be kept confidential, except in limited circumstances clearly outlined by Trulieve (and described as applying to California consumers only).

Additionally, Plaintiff and Class members reasonably believed that Trulieve would use part of the monies paid to Trulieve in order to keep their personal and health information confidential. This reasonable belief was rooted in the reasonable expectation of privacy that consumers have over their medical information.

119. Plaintiff and Class members would not have provided nor entrusted Trulieve with their personal and health information, or would have paid less for its goods and services, had they known that Trulieve had no intention of keeping this implied contract.

120. Trulieve breached its implied contracts with Plaintiff and the Class Members by disclosing their private information to unauthorized parties. As a direct and proximate result of Trulieve's breach of implied contract, Plaintiff and Class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of their bargain for which they paid and were overcharged by Trulieve for its services.

121. Plaintiff and Class members request all forms of damages with respect to these breaches of implied contract, including nominal damages.

## **THIRD CAUSE OF ACTION**

UNJUST ENRICHMENT

(On behalf of Plaintiff and the Class)

122. Plaintiff re-alleges and incorporates paragraphs 1 through 100 with the

same force and effect as if fully restated herein.

123. This cause of action is pled in the alternative to the breach of implied contract cause of action.

124. Defendant received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense. Specifically, the data collected from the Plaintiff and Class members has a monetary value, and instead of being able to sell their own data (or not have it sold at all) Trulieve sold that data to its contracted third parties to enrich itself, at cost to the Plaintiff and Class members. Indeed, the primary purpose of the interception and disclosure of Plaintiff and the Class Members' private information was to profit by selling it to third parties for marketing and revenue generation. In exchange for disclosing the private information of its customers, Trulieve is compensated by third party companies.

125. Defendant received benefits from Plaintiff and Class members in the form of the Plaintiff's highly valuable data, including health information and PII, that Defendant wrongfully disclosed and intercepted from Plaintiff and Class members without authorization and proper compensation.

126. Defendant disclosed, intercepted, stored, and used this data for their own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

127. Had Plaintiff known of Defendant's misconduct, they would not have provided any of their valuable data to Defendants or have used or paid to use the Trulieve website.

128. Defendant unjustly retained these benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

129. The benefits that Trulieve derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in every state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

130. Defendant should be compelled to disgorge profits into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION

COMMON LAW PUBLIC DISCLOSURE OF PRIVATE FACTS

(On behalf of Plaintiff and the Class)

131. Plaintiff re-alleges and incorporates paragraphs 1 through 100 with the

same force and effect as if fully restated herein.

132. In Florida, a claim for public disclosure of private facts requires the following elements: (1) the publication, (2) of private facts, (3) that are offensive, and (4) are not of public concern.

133. Plaintiff and the Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on its website.

134. This expectation is rooted in the traditional confidentiality of the physician-patient relationship and the widespread legal protections for medical privacy, including under the Florida constitution and Florida statutes explicitly protecting patient records. Fla. Stat. § 395.3025(4); Fla. Stat. § 395.3025(7)(b).

135. Even more to the point, the Florida Legislature has made it unmistakably clear that medical marijuana users have a strong expectation of privacy. Florida law exempts a medical marijuana user's personal information from Florida's broad Sunshine laws. Fla. Stat. § 381.987(1). Florida's constitution requires a public necessity statement in order to exempt information from public disclosure under Florida's Sunshine laws. Art. I, s. 24(c), Fla. Const.

136. Defendant disclosed Plaintiff's and Class members' sensitive and private information, including their personal and health information, to numerous third-party entities without their consent, constituting a "publication" under Florida

law.

137. The disclosed information includes highly private facts such as medical marijuana cardholder status and medical marijuana-related details, purchasing history, and geolocation data, in addition to full legal name, email address, and customer_id value linking subsequent activity to the same patient, all of which pertain to personal health and medical treatment and are inherently private. Taken together, these data points reveal not only who the patient is but also that the patient is a certified medical-marijuana user, which dispensary they frequent, what products they review or purchase, and when and where each interaction occurs—all highly sensitive health information that a reasonable medical marijuana patient would expect Trulieve to keep confidential.

138. The publication of this information is offensive to a reasonable person because it involves the unauthorized dissemination of sensitive medical and personal data, which is protected under social norms and privacy expectations, and is particularly stigmatized given the nature of medical marijuana use.

139. The private information disclosed by Defendant is not of legitimate public concern. Plaintiff's and Class members' use of medical marijuana and related transactions hold no relevance to public interest and should remain confidential.

140. The third parties receiving Plaintiff and Class members' information are not mere ministerial vendors performing purely administrative or mechanical

tasks on behalf of Trulieve. To the contrary, some trackers on Trulieve's site—those for SiteScout, RocketFuel and RFIhub – support behavioral targeting and real-time bidding ("RTB") for online ads. Once these trackers gather Trulieve patients' data—often in milliseconds—they pool the data with billions of other data points and re-broadcast it throughout the RTB advertising marketplace. In other words, a single Trulieve page view propels a patient's medical-marijuana status, card number, and other private personal details into a global advertising ecosystem. Once injected into this environment, mass dissemination is not merely possible but inevitable.

141. Because Trulieve knowingly funnels protected patient information into these RTB and data-broker ecosystems—and because those ecosystems by design disseminate each bid-stream payload to hundreds or thousands of downstream entities on every page view—the disclosure at issue is, at a minimum, substantially certain to become one of public knowledge.

142. Defendant's publication of Plaintiff's and Class members' private facts to third-party entities was done knowingly, intentionally, or recklessly, and without proper safeguards to protect this sensitive information.

143. The publication of Plaintiff's and Class members' private facts to advertisers and other entities made the information accessible in a manner that created a substantial likelihood of further dissemination, satisfying Florida's

requirement for liability, even if the information may have initially been shared with a limited audience.

144. As a result of Defendant's conduct, Plaintiff and Class members suffered harm, including emotional distress, reputational harm, invasion of privacy, and the diminution in value of their personal information.

145. Plaintiff and Class members are entitled to recover damages to compensate them for the harm caused by Defendant's conduct, including but not limited to actual, nominal, and punitive damages, as well as the disgorgement of profits obtained by Defendant from the use or sale of their private facts.

146. Plaintiff and Class members also seek injunctive relief to prevent Defendant from continuing to disclose their private facts as and to require Defendant to implement appropriate data safeguards.

147. Plaintiff believes injunctive relief is necessary because if Plaintiff continues to use Defendant's services for his medical marijuana purchases, Plaintiff believes that Defendant will continue the conduct complained of herein absent an injunction from this Court and therefore injunctive relief is necessary to cease Defendant's conduct.

148. Plaintiff further seeks all other relief from the Court deems just and proper.

## FIFTH CAUSE OF ACTION

SECURITY OF COMMUNICATIONS ACT, Fla. Stat. §§ 934.01–934.10

(On behalf of Plaintiff and the Class or, in the alternative, the Florida Sub-Class)

149. Plaintiff repeats and realleges paragraphs 1 through 100 as if fully set forth herein**.**

150. Florida law, including the Florida Security of Communications Act, applies to the claims of Plaintiff and the Class.

151. The Florida Security of Communications Act ("FSCA") makes it unlawful for any person to intentionally intercept, endeavor to intercept, or procure another to intercept any wire, oral, or electronic communication without the prior consent of all parties. Fla. Stat. § 934.03(1)(a)–(c). The FSCA further prohibits the "use," "disclosure" or any endeavors to use or disclose the contents of such intercepted communications. Fla. Stat. § 934.03(1)(b)-(e).

152. The FSCA creates a civil cause of action for private litigants:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including:
> …
>
> (b) Actual damages, but not less than liquidated damages, computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
>
> (c) Punitive damages; and

> (d) A reasonable attorney's fee and other litigation costs reasonably incurred.

Fla. Stat. § 934.10(1).

153. The FSCA was designed to protect private medical information. *See W.W. v. Oralndo Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

154. The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

155. As a corporation, Trulieve is a "person or entity" under the FSCA.

156. The data packets transmitted between a Trulieve account holder's device and Trulieve's servers while the user browses or purchases products on Trulieve's website, constitute a "wire, oral or electronic communication" within the meaning of Fla. Stat. § 934.03. These packets captured and transmitted information such as full name, email address, IP address, information about marijuana purchases and activity, physical location, customer_id, persistent device IDs, keystrokes and other regulated-use details, contact and device coordinates, scroll depth, and

behavior and transactional context details like mouse movements and keystrokes. This information constitutes protected health information as well as the substance, import, and meaning of communications between Plaintiff and the Class Members, on the one hand, and Trulieve, on the other.

157. The third-party tracking pixels, cookies, and other code that Trulieve embeds (or permits to be embedded) on its site constitute a "device" which "transmits a signal through, a wire, cable, or other like connection used in wire communication." Fla. Stat. § 934.03.

158. By installing, configuring, and directing the operation of those tracking devices, Trulieve intentionally intercepted (or conspired with, and intentionally procured the interception by, unauthorized parties of) Plaintiff's and Class members' communications with Trulieve, without securing the prior consent of all parties to those communications. Because of Trulieve's tracking technologies, which Trulieve intentionally embedded on its website, Plaintiff's and the Class Members' electronic communications were intercepted, recorded, and transmitted to unauthorized third parties during the communication and without the knowledge, authorization, or consent of Plaintiff and the Class Members.

159. Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

160. Trulieve further endeavors to and does in fact "disclose" and "use"

such intercepted communications for its own benefit—transmitting them to scores of advertising-technology companies—in further violation of § 934.03(1)(d)–(e).

161. Plaintiff and each Class member are "aggrieved persons" as defined in § 934.02(9) because their private electronic communications were intercepted, disclosed, and used without consent.

162. Trulieve's interceptions were knowing and intentional, undertaken to monetize sensitive medical-usage data for its own commercial gain. Such conduct warrants the full measure of statutory, actual, and punitive relief authorized by the Florida Legislature.

163. Trulieve's conduct is ongoing and continues to result in the unlawful interception of Plaintiff's and Class members' communications each time they access Trulieve's website, including password-protected areas, without their knowledge or consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent further interceptions, to require Trulieve to fully disclose its use of tracking technologies and data-sharing practices, and to mandate that Trulieve obtain users' express, informed consent before intercepting or disclosing their interactions and communications on its digital platforms.

164. Plaintiff therefore, on behalf of himself and the Class, seeks all relief authorized under Florida Statutes § 934.10(1), including preliminary and equitable relief such as an injunction prohibiting further interceptions; actual damages, but in

no event less than the greater of $100 per day of violation or $1,000 in statutory damages per plaintiff; punitive damages; and an award of reasonable attorneys' fees and litigation costs.

## VIII. DEMAND FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the proposed Class respectfully requests that the Court enter an order:

A. Certifying the Class and appointing Plaintiff as the Class's representatives;

B. Finding that Defendants' conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Defendants;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

## IX. JURY TRIAL DEMANDED

165. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

[*The Remainder of this Page is Intentionally Blank*]

DATED: July 2, 2024

Respectfully submitted,

/s/ Arturo Peña Miranda
Arturo Peña Miranda
Bar No. 1025613
Jennifer Czeisler*
Edward Ciolko*
**STERLINGTON, PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
Tel.: 407-259-0234
*arturo.pena@sterlingtonlaw.com*
*jen.czeisler@sterlingtonlaw.com*
*edward.ciolko@sterlingtonlaw.com*

Katherine M. Aizpuru (*pro hac vice)*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW
Suite 1010
Washington, D.C. 20006
Tel.: 202-973-0900
*kaizpuru@tzlegal.com*

*******Pro Hac Vice* forthcoming

Attorneys for Plaintiff Mark Robinson and the Proposed Classes